IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 27, 2021 Session

**STATE OF TENNESSEE v. RICO COOK**

**Appeal from the Criminal Court for Knox County**
**No. 113239   Steven W. Sword, Judge**

_____

**No. E2020-01494-CCA-R3-CD**

_____

A Knox County Criminal Court jury convicted the Defendant, Rico Cook, of two counts of felony murder, two counts of second degree murder, one count of attempted second degree murder, three counts of especially aggravated robbery, and one count of employment of a firearm during the commission of a dangerous felony.  Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus eighteen years.  On appeal, the Defendant argues the trial court erred (1) in denying the motion to suppress his statement to law enforcement, which he gave as a juvenile; and (2) in denying the motion to suppress the eyewitness identification evidence.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the Defendant-Appellant, Rico Cook.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen and Hector Sanchez, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The Defendant's convictions stem from the fatal shootings of two men and the wounding of a third man that occurred on June 22, 2017, in the Montgomery Village community in South Knoxville.  The three victims were selling marijuana out of their vehicle, and the Defendant, who was a juvenile at the time, got into the backseat of the victims' car and then shot and killed the driver and the front seat passenger, shot and wounded the backseat passenger, and stole the victims' marijuana.  Shortly thereafter, the

surviving victim identified the Defendant from a photographic lineup. The Defendant then turned himself into the juvenile detention center, where he was interviewed by a police investigator. During this interview, the Defendant confessed to shooting all three victims. On June 12, 2018, the Defendant was indicted for two counts of first degree felony murder, two counts of first degree premeditated murder, one count of attempted first degree premeditated murder, three counts of especially aggravated robbery, and one count of employment of a firearm during the commission of or attempt to commit a dangerous felony.

**Hearing on Motion to Suppress Statement.** Prior to trial, the Defendant filed a motion to suppress his statement, arguing that the factors outlined in State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998), weighed in favor of suppression. At the suppression hearing on this motion, A.J. Loeffler, an investigator with the violent crimes unit of the Knoxville Police Department, testified that he investigated the crimes in this case. He stated that on June 25, 2017, at approximately 11:45 a.m., he interviewed the Defendant at the Richard L. Bean Juvenile Detention Center in Knoxville. At the time, a juvenile arrest petition had been taken for the Defendant charging him with two counts of first degree murder. Investigator Loeffler said that the Defendant arrived at the juvenile detention center so that he could turn himself into the authorities.

Investigator Loeffler described the interview room as a basic conference room with a metal table and stools. He noted that he was working on a different matter when he was asked to talk to the Defendant about the instant crimes. As a result, Investigator Loeffler said he was wearing his police uniform pants, boots, and a black T-shirt, rather than a coat, shirt, and tie that he typically wears while working as an investigator. He noted that the Defendant was wearing jail clothing when he was brought into the room. Investigator Loffler said he recorded the entire interview, which lasted approximately forty-five minutes, with a portable digital recorder. He explained that no parent, guardian, or interested adult was present during this interview because the Defendant was already in custody.

Investigator Loeffler said that he read the Miranda[1] warnings and the standard written rights waiver to the Defendant. He stated that the Defendant appeared to understand his rights; however, he acknowledged that he did not ask the Defendant to explain the rights back to him or discuss the significance of these rights to ensure that the Defendant understood the meaning of the words used. He acknowledged that while a person might know what the word "lawyer" means, that person might not know how a lawyer could be beneficial to him or her.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Investigator Loeffler said the recording of the interview reflected that he read the Miranda rights to the Defendant and then asked the Defendant if he had any questions about these rights. He also placed an identical form, which included the rights and the waiver, in front of the Defendant so he could read along with him as he read the rights and waiver aloud to the Defendant. Investigator Loeffler said that the Defendant placed his initials beside each one of the rights to show that he understood them. The Statement of Rights and Waiver of Rights, which was initialed, signed, and dated by the Defendant, was admitted as an exhibit at the hearing. Investigator Loeffler asked the Defendant if he had graduated from high school, and the Defendant responded, "No," but indicated that he was "working toward" a GED (Tests of General Educational Development). When Investigator Loeffler asked the Defendant if he could read and write, the Defendant replied, "Yes." He acknowledged that he did not ask the Defendant the level at which he could read and write; however, he asserted that the Defendant did not appear to have any issues reading or writing during the interview. He said that the Defendant's demeanor "seemed normal" and when he told him why he was there, the Defendant asserted that he "was not involved in the shooting" and that "his name was brought up because . . . he was known out there." Investigator Loeffler said the Defendant was responsive to his questions and that the Defendant's statements were clear and made sense. He noted that the Defendant spoke English and did not appear to be under the influence of any intoxicating substances during the interview. In addition, he asserted that the Defendant did not appear to have any mental diseases, disorders, or any mental impairments during the interview.

Investigator Loeffler said that he told the Defendant that he knew what happened in the victims' car. He agreed that the Defendant became very concerned about his own safety and the safety of his family and became very emotional. He acknowledged that the Defendant told him that his family had been threatened and assaulted because of these crimes. He also acknowledged that the Defendant told him he wanted to go home and to go to a happy place. Investigator Loeffler admitted that he offered to help the Defendant if the Defendant was honest with him about what happened. He also admitted suggesting to the Defendant that the crimes were an accident, which he acknowledged was an interviewing technique in which the interviewer minimizes a defendant's role in the offenses. In addition, he suggested that the victims had a gun and that the Defendant reacted because he was scared. Investigator Loeffler said that at the end of the interview, the Defendant admitted that he shot the victims.

Sharainey Cook, the Defendant's mother, testified that she took the Defendant to the juvenile detention center because she knew he was a suspect in the two murders in this

case. Ms. Cook[2] said that when they arrived at the juvenile detention center, she told the staff, "[N]obody was allowed to talk to my son without me knowing or without me being present . . . [be]cause he had a lawyer." She said that the Defendant went into the back of the detention center, and she went back to work.

Prior to ruling on this motion, the trial court reviewed the audio recording from Investigator Loeffler's June 25, 2017 interview with the Defendant, which was admitted as an exhibit to the hearing. The recording shows that Investigator Loeffler initially asked the Defendant if he was okay, if he was hurt, and if he needed a doctor. Investigator Loeffler informed the Defendant that his name had come up in connection with a shooting and that one of the stories he had heard was that the Defendant had fired the shots and another story was that the person who was with the Defendant did it all. The Defendant initially stated that he "wasn't there" and just "heard a shot." He also said he was probably identified as the shooter because he ran away and because the people in Montgomery Village did not like him. Investigator Loeffler informed the Defendant that because he was already in custody, he was required by law to read him his rights.

Investigator Loeffler asked the Defendant how far he had gone in school, and he replied that he was "on and off" in school. The Defendant confirmed that he could read and write. He denied getting his GED but indicated that he was working on obtaining his GED.

Investigator Loeffler gave the Defendant the Statement of Rights and Waiver of Rights form and told him that he was going to read each of these rights to him and ask him to initial each one of his rights as he read them to him. Investigator Loeffler said that by initialing, the Defendant was stating that he understood these rights. Investigator Loeffler then reviewed each of the Defendant's <u>Miranda</u> rights, and the Defendant initialed each of these rights on the form. The Defendant confirmed that he did not have any questions about his rights. Then the following exchange occurred:

Investigator Loeffler: Down here, this reads, I understand each of my rights, I'm willing to make a statement and answer questions without a lawyer present. No promises or threats have been made to me. If you want to talk to me about what's going on I'm going to ask you to sign right there.

_____

[2] We have referred to Sharainey Cook as "Ms. Cook" to distinguish her from the Defendant, who shares the same last name. For the sake of efficiency, we have referred to the other witnesses by their last names only, and we intend no disrespect in doing so.

- 4 -

| | |
|---|---|
| Defendant: | But can I still get a lawyer though? |
| Investigator Loeffler: | If you want one.  Do you want one now?  Or do you want one, or do you want to talk to me first? |
| Defendant: | I'll talk to you first, cause [sic] I need my mind cleared. |

The Defendant said he did not shoot anyone because he did not want anyone to shoot him. He also said he did not know who committed these crimes.  The Defendant stated that he was close to where the crimes occurred because he heard the shots.  Investigator Loeffler reiterated that they could talk about the incident if the Defendant signed the waiver form. The Defendant then signed the form and stated that at the time of the shooting, he was walking up the hill to go see his cousin, Daquan Emory.  He said he was alone and walking toward the dead end when he heard about eight shots fired and decided to run home to see if his family was okay.  The Defendant said that the next thing he knew, people were telling him that his name had been mentioned in connection with the shooting.  He claimed that although there were people around when the shooting started, he did not know their names.

The Defendant said that he knew Deon Nolbert because Nolbert was his sister's boyfriend.  He claimed he first met Nolbert three weeks earlier, although he later asserted that he and Nolbert had been involved in altercations on and off.  He said that he knew his own name had been mentioned in connection with the shooting but had not heard anyone else's name in connection with these crimes.

Investigator Loeffler said he knew the Defendant was worried about a lot of things and scared, which he understood because this was "big time stuff."  He then told the Defendant, "If Deon has got you into something.  And Deon did something.  Now is the time to worry about Rico [referring to the Defendant].  Now is the time to worry about Rico's family.  Your mom.  Your dad."  The Defendant insisted that he would not have committed these crimes.  Investigator Loeffler then said,

Deon is telling me it's you.  I don't think it's you.  I think Deon did something and pulled you into it and now is using you as a way out.  Rico, now is the time to worry about Rico.  Deon is not gonna be there for you.  I promise you that.  All your other friends, all those other people out there, they're worried about themselves now, because this is serious.  And you know it's serious. Deon has pulled you into something.

The Defendant said, "They told me if I would tell you they gonna [sic] kill me." When Investigator Loeffler asked who told him that, the Defendant responded, "Money. And him." He said he did not know Money's real name and speculated that they may have said that to him because he was the youngest. The Defendant then said, "I didn't know they was gonna kill nobody [sic]." Investigator Loeffler responded,

> I talked to Money. Money is telling me you did it. If something else happened out there, Rico, like I said . . . . Money or Chris, he ain't gonna be there for you. Deon is not gonna be there for you. The only person there for you right now is Rico. Rico[,] you got to take care of yourself and your family.

Investigator Loeffler then asked the Defendant to tell him what happened, and the Defendant said, "I really don't know [']cause I walked away from the situation." When Investigator Loeffler asked him what happened before the shots were fired, the Defendant said that Deon and a girl named Larissa were texting about these guys who were selling marijuana. The Defendant said that neither he nor Deon knew these guys. When Investigator Loeffler asked if he knew what Larissa and Deon were planning, the Defendant said, "I guess to rob them[.]" The Defendant said that he had his own money, so he planned to buy $40 worth of marijuana. However, he started feeling that something was not right. He said the guys' car pulled up, and Deon and Money were with him. He noted that there were three or four white people inside the car, but he did not recognize anyone. The Defendant said he walked up to the passenger side of the car and gave his $40, got his marijuana, and walked off. The Defendant said that Money was on the porch nearby and Deon was at the front of the guys' car and that once he got his marijuana, he began walking up Daylily. Then the Defendant said,

> That's when I said, [it] sound[ed] like some shots were [fired] behind me. Didn't know it was him. So they shoot, you know, [I start] running. [I s]ee my sister [and] hop in the car with her. Then after that we pick up Deon, he's sweating. What's he sweating for, what did he do? Did he do something.

The Defendant said that Deon did not have a weapon or any marijuana when they picked him up. He offered that when they were initially walking up there to buy the marijuana, Deon did not have a gun, but Money had a gun. The Defendant said that he did not know that anything was going to happen. He said that when they picked up Deon, Deon said, "I didn't know he was gonna shoot them." When the Defendant asked who shot them, Deon acted like he knew but would not give him a name. The Defendant said that after that, they dropped Deon off at drum camp.

The Defendant then asserted, "I'm still a little kid, you know. I've seen Money shoot people. That's why I'm, you know, I'm scared. I don't know what's going on, I want to get out of here." He also said, "If I do get out of here, you feel me, I think I'm gonna [sic] die[.]" The Defendant claimed that he had seen Money shoot someone in the head and then asked, "How am I supposed to . . . get through that as a little kid[?]"

The Defendant claimed he was outside the car when he bought his marijuana, and Investigator Loeffler confronted him with the fact that the victims had texted Deon saying that they would not sell marijuana to anyone unless they got into their car. The Defendant eventually admitted that he got into the backseat of the car right behind the passenger, that Deon got into the backseat behind the driver, and that Damon Albert, who he referred to as "the big guy" was sitting in the middle of the backseat. The Defendant said that he got his marijuana, exited the car, and then ten or twenty seconds later, he heard the gunshots when he was in the area behind the parking lot.

When Investigator Loeffler asked why everyone pointed the finger at him, the Defendant said that he guessed because he was in the car and because they saw him running. The Defendant said that he was scared because "they" had told him that they were going to kill him and shoot his family. He asserted that "they" had already beat up his family, including his mother. Investigator Loeffler replied,

> Rico, tell me the truth about what happened in there and we can clear it—we can stop that. We—we can save everybody, we can protect everybody. But you've got to tell me the truth. Rico, if something happened in that car and you panicked. And you didn't mean for it to happen. Because that fat chubby kid, as you call him. He lived. He's talking to us. He told us what happened, Rico. It was an accident, it was a mistake. You got scared. What happened, Rico [?]

The Defendant said, "He started shooting," but when Investigator Loeffler asked who started shooting, the Defendant said, "I don't know." When Investigator Loeffler suggested that one of the kids in the car pulled a gun on him, the Defendant said, "Yeah, and Money pulled out the gun" and shot the guys in the car in order to protect him. Investigator Loeffler replied that he believed the Defendant had saved himself. When he asked the Defendant which one of the kids in the car pulled a gun on him, the Defendant said, "Didn't nobody pull a gun out . . . I don't know. I'm trying to tell you."

The Defendant claimed that, after the guys sold him marijuana, Money got in the car. Investigator Loeffler then said that he knew Money did not shoot the gun because they had done a test on him, which established that Money had not shot the gun. He again asked the Defendant what happened in the car. The Defendant replied that he was "scared," that

he wanted to "see [his] family," and that he wanted to be "in happy places."  Then the following exchange occurred:

| | |
|---|---|
| Investigator Loeffler: | And Rico I want you to be, but if you're not honest with me . . . All I have is a mean kid.  And you're not a mean kid Rico.  But Rico if you tell me this . . . |
| The Defendant: | You can't help me though. |
| Investigator Loeffler: | Because it was an accident Rico.  You—you got scared.  You got scared, that's all it was, and it was an accident. |
| The Defendant: | That ain't how they gonna [sic] look at it though. |

When Investigator Loeffler asked the Defendant one more time what happened that night and who gave him the gun, the Defendant disclosed that Money had given him the gun "for his safety" before he and Nolbert got to the car.  The Defendant said he saw someone inside the car pull out a gun, so he pulled his gun out first.  The Defendant then admitted, "I shot them, I shot them both."  When Investigator Loeffler asked him who he shot first, the Defendant replied, "I don't know."  He said that he "blacked out" because he was "scared."  The Defendant stated that he "shot the whole clip," gave the gun "back to Money," who was "on the porch," and then "ran" to his house.  The Defendant also said he gave Money the marijuana.  When Investigator Loeffler asked where this marijuana came from and if the Defendant knew this was going to happen, the Defendant denied knowing that this was going to happen and claimed that the marijuana he gave to Money was the marijuana that he had just purchased from the victims.  When Investigator Loeffler asked if Money planned to rob the people in the car, the Defendant responded, "I don't know man.  That's what I don't know."  When he was asked if Deon Nolbert planned on robbing them, the Defendant said he later discovered that Deon had planned to rob the victims, but he did not know it at the time."  The Defendant insisted that he just planned to buy some marijuana when he approached the car.

The Defendant explained that he got into the backseat of the car behind the driver and that when the front seat passenger pulled out a gun, he grabbed his gun from his right side and started shooting.  He said he gave the gun and the marijuana to Money right after firing the shots, and Money told him to run, so he ran the back way.  He said he was scared because he did not know the people in the car; he claimed he never planned to kill them and only intended to buy marijuana from them.  After making this disclosure, the

- 8 -

Defendant, who had become emotional, said, "I want to go stay with my mama and my daddy[.]" Initially, the Defendant said that he did not know what kind of gun the front seat passenger had, and when Investigator Loeffler asked if it was a "cowboy gun," the Defendant said, "Something like that, yeah." The Defendant asserted that the front seat passenger gave him the marijuana before pulling a gun on him, stating, "So, I was counting out $40.00. And [I] handed him the $40[, and] he gave me the weed, [and then he] pulled out a gun." He said that he did not take all the front seat passenger's marijuana, just the marijuana that he purchased, and insisted that he did not take the passenger's gun or his book bag. When Investigator Loeffler asked the Defendant if Money told him what to say, the Defendant said that Money did not tell him anything and that he had not talked to Money since the incident. The Defendant asserted that when he saw Deon Nolbert after the shootings, Deon "seemed like he . . . knew what was going on." The Defendant stated that when he fired the gun, he did not know where Deon was standing, although he and Deon ran away in different directions. The Defendant said he ran straight home, and then he went with his sister to pick up Deon.

After considering the evidence presented at the motion hearing and the recording of the Defendant's interview, the trial court entered an order on August 29, 2018, denying the motion to suppress the Defendant's statement. In this order, the trial court considered each of the six factors outlined in Callahan, 979 S.W.2d at 583. Regarding the first factor of age, experience, education, and intelligence, the trial court noted that the Defendant was fifteen years old, that he had a demeanor consistent with his age, that he had no evidence of any past involvement with the criminal or juvenile court systems. The court asserted that the Defendant did not appear to suffer from any mental disability, although he was deemed to need special education, and that school records showed that the Defendant read on a third grade level and had an IQ (Intelligence Quotient) of 92. The court stated that although the Defendant "was deemed to be in special education, he was taking classes with his non-special education peers" and "was able to express goals and understanding concerning his future endeavors through his education records." The trial court held that this first factor weighed "both in favor of the [D]efendant's position and the State's position."

Regarding the second and third factors, which were the Defendant's capacity to understand the Miranda warnings and the consequences of the waiver as well as the Defendant's familiarity with the Miranda warnings and the ability to read and write in the language used to give the warnings, the trial court acknowledged that the Defendant "had difficulty understanding written passages and being able to analyze specific details and themes in a text" and that "[t]here was no evidence that the defendant was familiar with the Miranda warnings prior to this interview." However, the court noted that the Defendant "could read and write in English." It found that the rights waiver was shown to the Defendant in writing, that the investigator read over each of these rights with the

Defendant, and that the Defendant initialed each right and did not ask for any clarification of those rights. The court recognized that before speaking to the investigator, the Defendant "asked a question about getting a lawyer," which "demonstrated that the defendant understood that he well might need an attorney and was concerned that he maintain that right to counsel if he chose to speak with the investigator." The court also found that the investigator properly sought clarification about whether the Defendant wanted an attorney at that moment or whether he wanted to speak with the investigator first, and the Defendant confirmed that he wanted to talk to the investigator, stating that he needed "[his] mind cleared." The court also noted that the investigator properly had the Defendant sign the waiver before they discussed the shootings. Specifically, the trial court found that "[t]he language both the investigator and the [D]efendant used appeared to be on a consistent level" and that it "saw no inability from the [D]efendant to understand the questions being asked or the language the investigator used during the rights wa[iv]er period or the interview." Regarding these two factors, the trial court stated:

> Understanding the gravity of the situation is not the same thing as understanding the nature of his rights and [the] consequences of waiving those rights. However, one of the rights he indicated that he understood was that anything he said could be used against him in court. Based upon his question about a lawyer and his expression of a self-serving reason to speak to the investigator at that time, the court finds that the [D]efendant understood that he did not have to speak with the investigator and that he had an appreciation of the consequences of choosing to speak to him in that such a conversation may be detrimental to him.

As to the fourth factor, the trial court acknowledged that there was "no proof that the [D]efendant was intoxicated or impaired from any substance."

Regarding the fifth factor, the trial court asserted that there was "no proof that the [D]efendant suffered from any mental disease or disorder" and that the proof showed the Defendant "was not mentally retarded, although he had some educational deficiencies."

As for the last factor, the presence of a parent, guardian, or interested adult, the trial court found not only that no parent, guardian, or interested adult was present but also that the Defendant was never asked if he wanted to speak to someone in those categories before making the important decision to waive his Miranda rights, which "weigh[ed] against a finding that the defendant made a knowing waiver of his rights." However, the court stated,

> On the other hand, it is obvious that the [D]efendant had very recent contact with his mother prior to speaking with the investigator. The investigator spoke to the [D]efendant approximately an hour after he had

been with his mother. She is the person who brought him to the juvenile detention center. Furthermore, she knew exactly why he was wanted in juvenile court. There is no proof that she spoke to the [D]efendant about his rights prior to taking him to the detention center. No one asked her that question during the hearing. However, she clearly understood her son's rights and they had an opportunity to discuss those rights when she transported him [to the] detention [center].

This ameliorates the investigator's failure to discuss this with the [D]efendant. Had the [D]efendant been arrested very soon after the shooting before he had a chance to speak to a parent and had his mother not brought him to [the] juvenile [detention center] on this very charge, the court's ruling on this issue may very well have been to grant the [D]efendant's motion. The police are strongly encouraged in the future to be sure a juvenile is given an opportunity to consult with an adult with no interests adverse to the juvenile's as part of the process of obtaining a rights wa[iv]er.

Ultimately, the trial court denied the motion to suppress, concluding, "Despite some factors weighing against the admissibility of the [D]efendant's statement, the court finds after examining the totality of the circumstances that the [D]efendant freely made a knowing and voluntary waiver of his <u>Miranda</u> rights."

**Hearing on the Motion to Suppress Eyewitness Identification Evidence.** The Defendant also filed a motion to suppress the eyewitness identification evidence, asserting that certain factors impaired the reliability of Damon Albert's identification of him, that Albert's identification was a cross-race identification, that the proper procedures were not followed during the photographic lineup, and that Albert was aided and coached to reconsider his identifications. The Defendant claimed that the identification procedure was suggestive because the officers never obtained a description of the perpetrator from Albert before administering the lineup; the officers knew the identity of the suspect prior to the lineup, which allowed them to influence the identification; the officers failed to inform Albert that the perpetrator might not be in the lineup; and the officers never requested a confidence statement after Albert made his identification. The Defendant then argued that under the totality of the circumstances, the identification procedure resulted in an unreliable identification, which required suppression.

At the suppression hearing on this motion, Dr. Jeffrey Neuschatz testified[3] that he was a cognitive psychologist and a professor of psychology at the University of Alabama and that his research was focused on eyewitness identification and jury decision-making. Dr. Neuschatz stated that when a person witnesses a complex event, that person remembers bits and pieces of the event and then fills in the gaps of memory with things that occur in the real world, which can be accurate or inaccurate. He asserted that the variables that can impact the accuracy of a person's memory are how long the person has to study the information, whether the person can rehearse the information, how much time elapses between when the information is received and when the person rehearses the information, whether the person is stressed, whether the person is distracted, and whether the person collects information related to the event after the event. He explained that people who are stressed tend to be less accurate in their identifications. He also said that when there is a weapon present, an individual is less likely to make an accurate identification because the individual is looking at the weapon rather than looking at the perpetrator's face. He stated that cross-race identifications are less accurate than when someone identifies a person of the same race. In addition, Dr. Neuschatz asserted that when a witness is exposed to post-identification information, that later information can replace what is in the witness's memory, unbeknownst to the witness, and then it becomes unclear whether the witness is making the identification based on their own memory from the event or from the information that they were exposed to at a later time.

Dr. Neuschatz stated that he had reviewed the lineup identification procedure that was done with Damon Albert, the photographic lineup itself, and the audio recording of the officer talking to Albert during the lineup. He noted that if a lineup is not done correctly, there is a risk that the person who is identified in the lineup did not commit the crime and that the wrong person will go to jail based on this misidentification. Dr. Neuschatz opined that all of the risk factors for a false identification were present with Damon Albert—there was a stressful situation, there was a weapon present, there was a cross-racial identification, and there was a very brief exposure time with the perpetrator.

Dr. Neuschatz said that Albert's familiarity with individuals in the lineup was also problematic; he claimed that in that scenario, the witness may discount the individuals he or she knows, which effectively reduces the number of people from which they are choosing in the lineup. Dr. Neuschatz said that in order to have a fair lineup, you need to have the following: (1) six to twelve innocent people in the lineup to reduce the chance of guessing; (2) a double-blind administration of the lineup so that the officer conducting the lineup does not know the suspect's identity and the eyewitness is told that the officer

---

[3] The record shows that at the June 17, 2019 suppression hearing, Dr. Neuschatz's testimony, which was under oath, took place via an audio connection after the video conference experienced technical difficulties. The State did not object to Dr. Neuschatz's testifying pursuant to an audio connection only.

conducting the lineup does not know the suspect's identify; (3) the eyewitness should be given an admonition that the perpetrator may or may not be in the lineup so that the eyewitness does not feel compelled to identify someone in the lineup; and (4) the eyewitness should provide a confidence statement, which indicates the eyewitness's confidence that the person they identified was the perpetrator of the offense. Dr. Neuschatz said that in a case like this one, where Damon Albert was told to reconsider his identification and to think more carefully about facial features and hair, the risk of a false identification is increased because such statements suggest that the perpetrator is actually in the lineup and that the witness should choose someone from the lineup. He said that it was important that officers not suggest that a non-identification is a failure because sometimes not identifying a person in the lineup is the right answer because the perpetrator is not included. Dr. Neuschatz stressed that eyewitnesses should make identifications based on their memory of what happened during the event, and if there is no one that matches their memory of the perpetrator, then it should be acceptable for eyewitnesses to say they are unable to identify anyone from the lineup. He added that it is important to preserve a witness's confidence statement at the time of the lineup so that if the witness's confidence in the identification changes over time, there is a record of what it was initially. He noted that a confidence statement made at the time of the identification is more accurate than a confidence statement made after the identification, even five minutes after.

Dr. Neuschatz stated that in this case, Albert explained his confusion by stating he thought "Money" and Deon Nolbert were the same person. He said this suggested that Albert did not have a clear memory of the perpetrator, although he was unable to say whether Albert's identification was accurate.

Dr. Neuschatz acknowledged the existence of literature that criticizes many of the principles he used during his testimony regarding the accuracy of witness identifications. He asserted that the presence of the factors he discussed leads to a reduced expectation that the witness's identification is reliable, not that the witness's identification in this case is inaccurate. He acknowledged that he had never spoken to Damon Albert and had never asked Albert about the stress he was under at the time of the incident or about the factors that could affect the reliability of his identification.

Allen Cook, an investigator with the violent crimes unit of Knoxville Police Department, testified that on June 22, 2017, the night of the offenses, he responded to the crime scene. He later went to the hospital to show Damon Albert, the surviving victim, three photographic lineups that included the Defendant, Kristopher Johnson, and Deon Nolbert, respectively.

Investigator Cook noted that because the Defendant was a juvenile, the Juvenile Court prepared the Defendant's photographic lineup. He acknowledged that the juvenile

court had told him where the Defendant's picture was located in the photographic lineup. He said that at the time he responded to the hospital, he and Investigator Preston Whillock were not absolutely sure of the identity of the shooter and only knew that the Defendant and Deon Nolbert were present at the scene.

Investigator Cook stated he arrived at the hospital at approximately 6:00 p.m. on June 22, 2017, which was around four and a half hours after the crimes occurred. At the time, he knew that Damon Albert, who had been sitting in the backseat of the vehicle, had been shot twice in the face and that the other two victims, who were sitting in the front seat, had not survived their gunshot wounds.

Investigator Cook said he informed Albert that he was going to show him some photographs and that Albert should let him know if he recognized anyone. When he showed him the photographic lineup created by the juvenile court, Albert pointed at the Defendant's photograph with no hesitation and stated that the Defendant was the person who shot him. Albert then told him that the Defendant had approached the small, four-door sedan and asked if he could get in, and after Albert cleared off the seat, the Defendant got into the backseat of the car behind the driver. Investigator Cook said that because Albert had injuries to his face, he concluded that Albert had faced the Defendant at the time the Defendant fired the shots at him. He said Albert told him that he and the Defendant had spoken briefly about the money and the marijuana and that he believed that the Defendant was reaching into his pocket for his money when the Defendant pulled out a gun and began shooting. Investigator Cook said that although Investigator Whillock told Albert that the perpetrator's hairstyle and facial hair might be different when Albert was looking at the second photographic lineup that included Kristopher Johnson, this discussion had nothing to do with the first photographic lineup where Albert identified the Defendant. He also said that while Albert never identified Johnson in the second photographic lineup, Albert did identify Nolbert without hesitation in the third photographic lineup. Investigator Cook stated that prior to the photographic lineups, Albert had provided no descriptions of the perpetrators in this case. He noted that when the officers first encountered Albert at the scene, Albert had been shot, and they were trying to get basic information from him and asked him who did this, but they never got descriptions of the individuals who had committed these crimes.

The audio recording of these photographic lineups was admitted as an exhibit to the hearing. During this recording, Investigator Cook informed Albert that he had been "out there at the scene." Thereafter, the following discussion occurred between Investigator Cook and Albert:

| | |
|---|---|
| Investigator Cook: | I'm gonna show you some line ups, ok[ay]?  And I want you to tell me who you recognize.  Fair enough? |
| | See anybody in there?  That's the one?  What did he do? |
| Albert: | He shot me. |
| Investigator Cook: | That's the one that shot you? |
| Albert: | I know that one. |
| Investigator Cook: | ok, and what I need you to do— |
| Albert: | I know that one, I know another person— |
| Investigator Cook: | Ok, I need you to circle that for me if you can.  Can you write your name right there?  Is it possible for you to write your name? |
| Albert: | Yeah. |
| Investigator Cook: | Ok, he's the one that shot you? |
| Albert: | Yeah. |

When the officer asked what happened, Albert said that he and the guys with him were going to sell the Defendant some marijuana and that when they arrived, two people walked toward them from a porch.  Albert said the one of the guys asked if he could get in the car, and he said "yeah" and moved some things out of the way in the backseat.  Albert asserted that "it happened so fast," explaining that "[the Defendant] reached into his pocket, act[ed] like he's gonna [sic] get the money, and then Boom! Boom! boom boom boom."  Albert said that his brother had the marijuana in his hand, and the Defendant "took the weed and took off with it."

Investigator Cook then stated that he was going to show Albert a second photographic lineup since Albert said "there were two guys."  Looking at two photographs, Albert said it was "a cross between him or him" because of the hair.  At that point, Investigator Whillock said that the person might "look exactly the way he did" or might look "different" and told Albert to not focus on the hair and instead focus on the things that did not change like the eyes, nose, ears, mouth.  Investigator Whillock also told Albert not

- 15 -

to worry about what the people in the lineup were wearing. Albert ultimately did not identify anyone from the second photographic lineup.

Investigator Cook then stated that he was going to show Albert a third lineup and said, "See if you recognize anybody." Albert quickly identified Deon Nolbert as person he was messaging about the marijuana and said that Nolbert was "the one that didn't get into the car." He clarified that "[t]here were two guys in total" and the Defendant "got in the car" and Nolbert "waited outside the car."

Close to the end of this recording, Albert complained that Investigator Cook had cursed at him at the scene, and Investigator Cook replied that Albert had told him that he did not know who fired the shots, even though he was sure he knew who was responsible. Albert said, "Well I did, but it was like I couldn't be sure."

After hearing this proof, the trial court entered an order on June 19, 2019, denying the motion to suppress the eyewitness identification evidence. In this order, the trial court found that when presented with the first photographic lineup, Damon Albert "within a matter of seconds identified the [D]efendant as the person who shot him." The trial court emphasized the fact that Albert had a conversation with the Defendant in the car "before a gun was ever displayed" and that "[t]here were no indications that the event was stressful until the gun was produced [by the Defendant]" The court also noted that although two more photographic lineups were presented to Albert, the investigator's comments regarding, for example, changes in hairstyles, "were not made during the identification of the [D]efendant" and "were only made after Mr. Albert picked the [D]efendant out of the first lineup." In addition, the court recognized that Albert was able to "quickly identify" Deon Nolbert in the third lineup as the person he had been messaging regarding the drug transaction. The court found that Albert's identifications of both the Defendant and Deon Nolbert "appeared to have been made with confidence[.]" The trial court noted that although Dr. Neuschatz testified to the presence of factors which contributed to concerns about the reliability of the identification, Dr. Neuschatz "did not express an opinion that the identification of the [D]efendant was, in fact, unreliable" and Dr. Neuschatz's written report appeared "mostly concerned with the second photo line-up presentation[,] which occurred after the [D]efendant had already been identified." When determining whether the lineup procedure was unduly suggestive, the trial court stated:

> Although there may be some concerns with statements made by the investigators during the second photographic line-up presentation, this only occurred after Mr. Albert clearly identified the [D]efendant as the shooter through the first line-up. The investigators made no suggestive statements to the witness about the line-up. The photographic array[] itself does not appear to be suggestive. All six individuals look very similar. Although the

witness may have known one or two of the other individuals in the array, there is no indication that this was anything other than chance. There is no proof that the preparer of the line-up did anything other than generate a photo line-up with five other people who looked significantly similar to the [D]efendant. Thus, the court finds that there is no evidence to indicate that the procedure used by the investigators was unduly or unnecessarily suggestive.

Although the trial court found that "[l]egally, that [wa]s the end of [t]he inquiry," it nevertheless examined the factors outlined in Neil v. Biggers, 409 U.S. 188 (1972), to determine whether the identification was admissible or was so suggestive that admitting it would violate due process. Applying these factors, the court held that Albert "had a sufficient opportunity to view the suspect in order to later identify him," that Albert paid "significant attention to the person who ended up shooting him," that Albert gave "no prior description" of the suspect, that Albert "indicated a strong level of certainty regarding his identification of the defendant," and that Albert's "identification of the [D]efendant occurred less than five hours after the shooting[,]" which "weigh[ed] in favor of the reliability of the identification." Ultimately, the trial court denied the motion to suppress, concluding that "the identification procedure and the photographic array itself were not unduly or unnecessarily suggestive" and that under the Biggers factors, the "identification was reliable."

**Trial.** We have summarized only the evidence presented at trial that is closely related to the two issues raised on appeal. At trial, Damon Albert testified that before June 22, 2017, he did not know Deon Nolbert or Rico Cook, the Defendant. Although Albert had heard of someone named Kristopher Johnson, who went by the nickname "Money," he had never met him. Albert said that at the time of this incident, Sergio Rivera was driving a four-door Chevy Malibu, Albert's half-brother Jaloen Morris was sitting in the front passenger seat of this car, and Albert was sitting directly behind Morris in the backseat. Albert said that the Defendant and Nolbert approached their car. The Defendant asked if this was where he got in. Albert moved a backpack to make room, and the Defendant got into the backseat of the car and sat directly behind Rivera. Albert was smoking a cigar at the time, and he observed Deon Nolbert, who was still standing outside the car, joking around with Morris, who was still in the front passenger seat of the car. Albert saw the Defendant reach for his pocket, presumably to get out his money. Albert looked out the car window, "ashed" his cigar, and then heard a loud sound as a bullet passed through his head. He asked the Defendant if he shot him, and then he saw the Defendant's gun and observed the Defendant shooting him a second time. Albert said he blacked out and regained consciousness a few times. He then saw the Defendant shooting Morris at point-blank range, although he could not hear anything because his ears were ringing. When the Defendant fired these shots, Morris was struggling with the Defendant over the

marijuana. After the Defendant shot Morris, Albert saw blood pouring out of Morris's head, and it was obvious Morris was dead. Albert did not see what happened to Rivera, although he saw Rivera bleeding following the shooting. Albert said he got out of the car, started asking people who shot him and for them to call the police, and then attempted to call 9-1-1 on his phone. He also tried to follow the Defendant and Nolbert but was unable to see which way they went because his vison was blurry after being shot.

Albert said that he initially told police at the scene that Deon Nolbert was responsible for the incident because that was "the only name [he] knew." Albert said that a short time later he identified the Defendant as the shooter in a photographic lineup just after he got to the hospital for his injuries. He said that he did not know the Defendant's name at the time but identified him as the shooter. He noted that he did not identify anyone in the second photographic lineup but did identify Deon Nolbert in the third photographic lineup. Albert said that the reason he had trouble with the second photographic lineup was because he believed that Deon Nolbert and "Money" were the same person. Albert identified the Defendant at trial as the person who shot him and who shot and killed Morris and Rivera. Albert reiterated that Deon Nolbert was outside the car when the Defendant started shooting and that Nolbert "looked surprised" and "flabbergasted" when he first heard the gunshots.

Courtney Walker testified that in June 2017 she lived in an apartment in the Montgomery Village community with her two young daughters and her friend Amanda Pride. At the time, she knew who the Defendant was, although she had no personal interaction with him. She also knew Kristopher Johnson but only knew him as "Money." Walker said that Kristopher Johnson had been inside her apartment because he was talking to Amanda Pride and that whenever she saw Johnson there she would ask him to leave because he was in a gang and had a bad reputation. On June 22, 2017, Walker was washing dishes in her apartment when she heard some gunshots, which alarmed her because there were kids outside. She immediately ran outside to parking lot C and saw one of the victims, whose face was covered in blood, jump out of the car and pass out on the ground and then she saw Johnson run inside her apartment. At the same time, she saw Iquan Harris, who went by the name "Jersey," on the porch of one of the apartments. Walker also observed the Defendant, who was alone, running behind the apartments. She recalled seeing Deon Nolbert in parking lot C but said Nolbert was not running and was not near the victims' car. Walker returned to her apartment and told Johnson he needed to leave. She noticed that Johnson was "sweaty and very anxious." She said Johnson pointed a gun at her and Amanda Pride and told them "to shut up and sit down." Then Johnson got a chair and went up into the ceiling, and she and Pride ran outside and encountered a detective. Walker gave the detective permission to search her apartment, and she later learned that the police had found a gun in her attic. Walker said that she did not own a gun and did not store any guns in the attic and that when she exited her apartment, she believed that Johnson was

attempting to hide his gun in her attic. She said that around midnight, Johnson tried to come back inside her apartment to "get something." When she refused to let him inside, Johnson told her he needed to get something out of her apartment, and if she refused to let him get it, he would call the police and claim that there were drugs inside her home. Walker later realized that Johnson had put on Amanda Pride's pants while at her apartment and had left his sweatpants, which had marijuana in the pocket, behind. Walker identified the Defendant at trial as the person she saw running away from the scene where the gunshots were fired.

Alfred Courtney testified that he saw the shooting at the Montgomery Village apartments. He saw the Defendant and another African-American man walking down the road, heard one of them say to turn into parking lot C, and then two minutes later, observed a car pulling into that lot. Courtney said there were two African-American men in the front seat and one Caucasian man in the back of the car. Courtney asserted that the Defendant and the man with him walked up to the driver's side of the car and then he heard six or eight gunshots and saw both of the men running in different directions. He said he never saw the Defendant or the man with him get into the car. He eventually saw the guy in the backseat get out and ask for help after the shooting. He acknowledged that he never saw who fired the shots. Courtney identified the Defendant at trial as one of the men who approached the victims' car. He also identified Deon Nolbert as the other man who approached the car. Courtney acknowledged that when he heard the gunshots, everyone in the area started running, and a few kids and adults actually ran into his home to try to get to safety.

Darrell Sexton, a patrol officer with the Knoxville Police Department, testified that when he initially encountered Damon Albert, who had been shot in the face, Albert told him that that he did not know who had shot him.

Deon Nolbert testified that he did not know Damon Albert, but he began contacting Albert over the social media platform Facebook after Laurissa Brockwell told him that Albert was selling marijuana. Nolbert asked the Defendant if he wanted to buy some marijuana, and the Defendant said he did not have any money, although he had "some fake hundred-dollar bills." Nolbert said he and the Defendant took photographs of the fake money and sent the photographs to Albert to make it look as though they had money to buy the marijuana. Nolbert said that he made Brockwell ask how many people would be with Albert because he and the Defendant intended to give Albert and the men with him the fake money as payment for the marijuana.

Nolbert said that before he encountered Albert, he and the Defendant saw Kristopher Johnson on the sidewalk, and the Defendant told Johnson that they had "a lick," meaning a robbery. He said that as the Defendant and Johnson continued talking, Nolbert walked

over to a nearby porch, and then the Defendant and Johnson joined him on the porch a few moments later. When they saw Albert's car appear, Johnson handed the Defendant a gun. Although Nolbert did not recognize the driver and the person in the passenger seat, he recognized Albert from his Facebook photographs. Nolbert said that he knew the Defendant had a gun, so he was aware that the gun was going to be used during the robbery. Nolbert also said that even though he had an opportunity to back out of the plan, he did not do so because he was scared.

Nolbert stated that the Defendant left the porch first and then he left the porch, and they both approached Albert's car while Johnson stayed on the porch. He asserted that the Defendant walked over to the backseat behind the driver and that he walked to the front seat passenger side of the car, where he stood and joked with Jaloen Morris, although he did not know his name at the time. Nolbert said the Defendant got into the car with the fake money, and he thought the Defendant "was going to do the transaction." When Morris handed back the marijuana, the Defendant started shooting and said, "B[---]h" each time he pulled the trigger. The Defendant exited the car and then ran back to Johnson and handed him the gun and the marijuana, and Johnson "shooed" the Defendant away. At that point, Nolbert ran around the building. He said he was surprised when the Defendant started shooting because he "just thought [they] were going to give [Albert and the people in the car] the [fake] money." Nolbert ran toward a tree line that led to the train tracks and back to a parking lot. He then jumped into his girlfriend's car, where the Defendant's sister was a passenger, and a moment later, the Defendant jumped into the car. Nolbert told the Defendant, "What the f[--]k was that?," and the Defendant replied, "I shot 'em . . . He tried to grab me. I shot his a[-]s again." The Defendant also said that he was "about to be Cripped." Nolbert acknowledged that the Crips were a gang.

Nolbert stated that he never called the police about these crimes because he was "scared" and "shocked" and "didn't know what to do." He said his girlfriend took him to the drum camp where he was supposed to work that day, and he changed his clothes because he did not want to be seen wearing the same clothes he was wearing at the scene. Nolbert said that he was arrested later that night and that he told Investigator Loeffler what happened. Although he initially informed Investigator Loeffler that the Defendant set up the deal regarding the marijuana, he later told him that he actually set up the drug deal. He disclosed that he would be pleading guilty to facilitation of these crimes. Nolbert identified the Defendant as the person who fired the shots, killed Morris and Rivera, and stole the marijuana.

Investigator Loeffler provided testimony at trial that was similar to the testimony he gave at the suppression hearing. He also testified that he responded to the crime scene but noted that the Defendant was not present there during his investigation. Investigator Loeffler said that the first person who was developed as a suspect in the offenses was

Kristopher Johnson and that the Defendant was not developed as a suspect until certain individuals were interviewed a few hours later.

Investigator Loeffler said that on June 25, 2017, while he was working another job and outfitted in his patrol uniform, the district attorney informed him that a family member had brought the Defendant to the juvenile detention center in Knoxville. He stated that the Defendant's family was not present at the center when he arrived. Investigator Loeffler said he had removed his gun, Taser, and duty belt and was wearing a black T-shirt, patrol pants, and patrol boots when he entered the detention center. He asserted that he had already obtained the petition, which is the arresting instrument, for the Defendant on June 22, 2017, and that when the Defendant turned himself in, he was immediately taken into custody, which meant that the Defendant was already in custody by the time Investigator Loeffler interviewed him. Investigator Loeffler explained that because there were no interview rooms with cameras in the juvenile detention center, he recorded his interview with the Defendant on a digital recorder. The audio recording of Investigator Loeffler's interview with the Defendant was played for the jury.

Investigator Loeffler stated that, at the crime scene, Damon Albert informed him that Deon Nolbert was the one who shot him. He also said Albert showed him a Facebook photograph of Nolbert on his phone and said he had messages between the two of them. Investigator Loeffler said he later discovered that Kristopher Johnson had taken the murder weapon to Courtney Walker's home, where it was later recovered. He acknowledged that Investigator Cook and Investigator Whillock left the scene and showed Albert photographic lineups at the hospital.

Investigator Loeffler said that when he interviewed the Defendant at the juvenile detention center, he asked if the Defendant was hurt. He also told him that he could help him, but he had to tell the truth. He said the Defendant seemed worried and scared and claimed that Kristopher Johnson and "them" were going to kill him if he talked because they had already beat up his mother.

Investigator Loeffler said that the Defendant initially denied having anything to do with these offenses. He then suggested to the Defendant that it was an accident so he would admit that he was involved. Investigator Loeffler also suggested that someone in the car had pulled out a gun and that the Defendant had fired in response, which indicated that the Defendant acted in self-defense, even though Investigator Loeffler did not believe this was what happened. He admitted that after he made these suggestions, the Defendant confessed that he had shot the victims.

Investigator Loeffler acknowledged that he employed the technique of minimalization, which minimizes the suspect's part in the offenses and provides a

justification of why the offenses may have happened. He also acknowledged that it was a well-accepted technique to deceive suspects in interviews. He said his primary goal in an interview was to keep the suspect talking, regardless of whether the suspect was an adult or a juvenile.

Anthony Fletcher, a correctional officer at the Richard L. Bean Juvenile Detention Center, testified that the detention center was essentially a jail for juveniles. He stated that on July 19, 2017, an incident occurred at the juvenile detention center in which the Defendant "threaten[ed] to kill someone" when he got out if he saw that person on the street. He said the Defendant yelled that "he had killed people to get in there," that "he wasn't afraid to kill the officers that had locked him up," and that he "would kill the next person that open[ed] his door . . . just like the fools that he had . . . shot before."

Dr. Brian Cutler, a professor of psychology at Ontario Tech University, was accepted as an expert in the field of forensic psychology. Dr. Cutler testified that one interrogation technique is called direct positive confrontation, where the interviewer confronts the suspect with his guilt from the very start, rather than entertaining the idea that the suspect is innocent. He stated that this technique is very effective because the interviewer takes the suspect's "denials and . . . the expressions of innocence off the table by convincing the suspect that [the interviewer] know[s] the suspect is guilty." Dr. Cutler also said that interviewers rely on real or fabricated evidence "to put further pressure on a suspect to confess" because the suspect has "no way of establishing [his or her] innocence." In addition, he stated that interviewers use the technique of "minimalization[,]" where the interviewer suggests "excuses or rationales for . . . commit[ing] the crime that make it appear that it's not as bad as it sound[s]." He said an interviewer may suggest that the crime was "an accident" or "a spur of the moment thing" or an "impulsive act" or that the suspect was acting in "self-defense." Moreover, he explained that interviewers often used the technique of offering help, although this is not an advisable tactic because it can make the suspect "think that if he confesses he will be treated more leniently than if he maintains his innocence." He said that interviewers "know they can't promise leniency in exchange for a confession" but they can "use tactics that make suspects conclude that on their o[w]n."

Dr. Cutler said that the three factors that make suspects particularly susceptible to a false confession are youth, developmental disabilities, and mental illness. He stated that youth was a factor because younger individuals "focus on short-term rather than long-term consequences" and have "poorer judgment than adults." Dr. Cutler said that innocent people confess when they "become[] so stressed, . . . so depleted that they just want to get out of there . . . [and b]elieving that they have no chance of convincing this interrogator of their innocence, . . . they confess." He added that sometimes an innocent person can include details of the crime in their confession because the interrogator "actually educate[s] the suspect on how the crime occurred" so that "when the suspect confesses, [he or she] gives,

- 22 -

basically, a detailed story" of the crime. Dr. Cutler also described the technique of guilty knowledge, wherein the interviewer not only gets an admission from the suspect but also gets the suspect to produce details that only a guilty person would know, and then the police "go out and corroborate those details[.]"

Dr. Cutler said that after reviewing the recording of the Defendant's interview, he identified the interviewer's use of evidence ploys, minimization, and clear offers of help, which increased the risk of a false confession. He stated that "the more pressure you put on . . . an innocent suspect, the . . . greater the likelihood that an innocent suspect w[ill] falsely confess." He also agreed that the interviewer's pressure can be friendly and that the interviewer does not have to be aggressive to apply pressure to a suspect.

Dr. Cutler acknowledged that he was being compensated for his time and that although he was a professor, he made additional income testifying about false confessions in cases around the country. He said that he had been both rejected and accepted as an expert in various cases.

Dr. Jeffrey Neuschatz was accepted at trial as an expert in the field of cognitive psychology and provided testimony similar to the testimony he gave at the suppression hearing. Dr. Neuschatz also stated that when a person is stressed, that person's memory for facial recognition and identification is not as strong because stress causes the person to focus on fewer things. He also said it is more difficult to identify a person of a different race than a person of the same race. He explained that when individuals encounter a person of a different race, they process the person's "face as a whole" and fail to pick out specific characteristics.

Dr. Neuschatz asserted that after reviewing the lineup procedures the police used with Albert, he observed that the officers conducting the lineup were not "double-blind" because they knew that the suspect had been included in the lineup. He said this could be a problem because someone who is not "double-blind" can influence the witness, whether intentionally or inadvertently, and can give off cues as to who is the suspect in the lineup He also said that the officers conducting this lineup never said that the perpetrator might or might not be in this lineup; instead, they just asked Albert if he recognized anyone in the lineup. In addition, Dr. Neuschatz said that Albert declared that he knew two other people in the lineup, which reduced the number of photographs that he was considering from six to four. Finally, he stated that the officers never asked Albert to provide a confidence statement for the person he identified, so there was no way to evaluate the confidence Albert had in identifying that individual.

Dr. Neuschatz acknowledged that he had been compensated to testify at trial. He confirmed that he had never talked to Damon Albert. He acknowledged that he was not making a judgment on the accuracy of Albert's identification of the Defendant.

Dr. Kimberly Brown, who was accepted as an expert in the field of forensic psychology, testified that she was the director of the forensic evaluation team that provides all of the court-ordered forensic evaluations for Davidson County and that she had been hired by the defense to evaluate the Defendant in March 2018 and in January 2019 and to review some documents and materials related to the Defendant. She stated that when she first evaluated the Defendant, he was fifteen years old.

Dr. Brown asserted that a male's brain continued to develop until he reached his early to mid-twenties. She also noted that fifteen-year-olds are "much more impulsive," "much more likely to take risks without appreciating the long-term consequences," and are "much more likely to be influenced by peers." Dr. Brown also determined that the Defendant had attention deficit hyperactivity disorder (ADHD), a disorder that can affect a person's "impulse control" and can make a person "hyperactive" and "even less likely to think through the consequences of [his] actions."

Dr. Brown said that, from kindergarten, the Defendant had problems learning, especially with reading. She stated that the Defendant received special education services, had an individualized education program, and was diagnosed with a learning disability in reading. She noted that in standardized testing the Defendant did poorly in all subjects and that the Defendant's GPA was a .25. When she administered an IQ test in March 2018, the Defendant scored in the seventh percentile. She acknowledged that the Defendant's school gave him a partial IQ test and that the Defendant scored "significantly higher" on that test than the one she gave him. However, she accounted for this discrepancy by stating that the Defendant's school had not administered a full IQ test, merely portions of a test.

Dr. Brown said that someone with an IQ as low as the Defendant's would not process things the same way most other people do, would be unable to understand the intent of the interviewer, and would be unable to reason through their choices as well as someone with an average IQ. She asserted that people with a lower IQ are "more likely to be suggestible, easily led, easily influenced by others, willing to please authority." When she conducted a memory test with the Defendant, her findings were "very remarkable" because the Defendant "would change his answers pretty quickly" and would "introduce wrong facts about the story." She said that a person with findings like that on that test would be "more suggestible," "more influenced by . . . promises that the detective might make," "more influenced by pressure to say something," and would be more likely to "say[] what they think the person wants to hear."

Dr. Brown acknowledged that regular use of marijuana during adolescence can degrade intelligence and that the Defendant had admitted to using marijuana and Xanax since the age of twelve. She acknowledged that the degradation of the Defendant's IQ could have been attributable to his voluntary ingestion of marijuana over the years, although she believed that the Defendant's history of struggling academically was more consistent with the IQ score that she obtained.

Dr. Brown acknowledged that she had diagnosed the Defendant with a conduct disorder, which considers an person's "patterns of rule violations, breaking rules, breaking laws, hurting other people, stealing, robbery . . . ." She also acknowledged that during her evaluation, the Defendant told her that he was at the scene of the crimes, that he had gotten into the vehicle with the victims to buy marijuana, that Kristopher Johnson had surreptitiously walked around the car and shot the victims with a .45 caliber gun, that the Defendant had exited the victim's car, that Johnson had run out of bullets, and that the Defendant had exited the car and returned fire, and that the Defendant had not left any shells behind because he had a shell catcher on his gun. Dr. Brown agreed that the discovery in this case showed that nine nine-millimeter shell casings were found inside the vehicle, which was at odds with what the Defendant had told her about what happened. She stated that during her testing, the Defendant "didn't recall facts very well, and then he made up facts that weren't true." She recognized that "if [the Defendant] has the tendency to do that," then there would be a concern that he would do that "in other situations as well where he's asked to recall a story."

Dr. Brown acknowledged that on the test "designed to assess someone's understanding of their Miranda warnings," the Defendant "seem[ed] to understand what the Miranda warnings are and what they meant[,]" and the Defendant "score[d] consistently or even a little bit higher than other juveniles his age." She also acknowledged that on the suggestibility test, the Defendant "didn't have a significant tendency . . . to change his answer once he said something, even if it was wrong." However, she said that the pressure that she exerted on the Defendant during the suggestibility test, namely that of an authority figure being forceful and telling him he did not do a good job and would have to answer the questions again, was different from the pressure that occurred during the Defendant's interview, which was the "pressure to protect himself and . . . his family with someone who was, he perceived, offering him some help." She also asserted that the ability to understand the Miranda warnings was different than the ability to resist psychological pressure and the ability to understand long-term consequences.

The Defendant, Rico Cook, testified that although he was seventeen now, he was fifteen years old at the time of this incident. He recalled speaking to Investigator Loeffler at the juvenile detention center shortly after he turned himself in there. He said Investigator Loeffler immediately asked him if he was alright, which made him think that he was

concerned about him. He acknowledged that some of the things he told Investigator Loeffler were true and that some were not true. He said that although Investigator Loeffler read him his <u>Miranda</u> rights, he did not understand what they meant. He claimed he signed a form stating that he understood his rights because he felt like that was something he had to do. The Defendant then told Investigator Loeffler that he needed his name cleared because did not shoot anyone, which he asserted was the truth. He said he was going to see his cousin, Daquan Emory, that day and heard eight shots and started running. When Investigator Loeffler asked him who Deon Nolbert was, the Defendant felt like Nolbert had mentioned his name because they had been involved in altercations in the past. The Defendant said Investigator Loeffler also encouraged him to worry about himself and his family if Nolbert had pulled him into something criminal, which made him feel like they were on the same page. The Defendant said he told Investigator Loeffler that Kristopher Johnson and Deon Nolbert threatened to kill him if he talked about the incident and that Nolbert and a girl, Laurissa, were texting about buying some marijuana from the victims prior to the shootings. When Investigator Loeffler asked him if he knew what Nolbert and Laurissa were planning, the Defendant said he thought they were going to rob the victims because Nolbert was asking for Kristopher Johnson, who was involved in some seriously criminal acts.

The Defendant said he was planning to buy forty dollars' worth of marijuana but he felt like something was not right because Johnson was nearby. He also told Investigator Loeffler that when the victims' car pulled up, he gave one of the victims forty dollars and received the equivalent of five blunts of marijuana because he wanted to exclude himself from the situation. The Defendant said that the truth was that after he left, he heard what sounded like shots fired, although he did not know who was responsible, and then he ran off. The Defendant told Investigator Loeffler that Kristopher Johnson had a semiautomatic gun, which was also the truth. He also said that after this incident, he took Deon Nolbert to drum camp. The Defendant told Investigator Loeffler that he had seen Johnson shoot people and that he was worried that Johnson would hurt his family and him, if he ever got released. He also said that he was more worried about Johnson and the other people on the streets than Investigator Loeffler.

The Defendant said that he said he got into the backseat of the victims' car because he believed that was what Investigator Loeffler wanted to hear. He insisted that people from the streets were going to kill his family and that they had already beat up his family members, including his mother, which was true. The Defendant asserted that after disclosing this information, Investigator Loeffler told him that if the Defendant told him the truth, he could protect everybody. When Investigator Loeffler suggested to him that the shootings might have been an accident, the Defendant said that he felt like he needed to tell Investigator Loeffler what he wanted to hear. The Defendant stated that Investigator Loeffler did not believe his claim that Kristopher Johnson shot the victims and then

Investigator Loeffler suggested that the victims had pulled a gun on the Defendant and that the Defendant then shot them to protect himself. The Defendant said that even though he told Investigator Loeffler that none of the victims pulled out a gun while he was there, Investigator Loeffler was not satisfied with his response. When Investigator Loeffler informed him that he knew that Kristopher Johnson had not gotten into the victim's car, the Defendant said he was scared, and Investigator Loeffler told him that it was time to tell him what he wanted to hear. The Defendant said he wanted to see his family and be in happy places, and Investigator Loeffler again suggested that the Defendant shot the victims because he got scared and that it was an accident. The Defendant said he replied that "that ain't how they're gonna look at it" and started to cry because he felt helpless, even though Investigator Loeffler had reassured him. The Defendant explained that although he told Investigator Loeffler that Kristopher Johnson gave him the gun, this was not the truth and that he only said it because it was what Investigator Loeffler wanted to hear. The Defendant then said he shot both of the victims and when Investigator Loeffler asked him which one he shot first, he did not know because this version of the events was not the truth. The Defendant also said that he got into the car behind the driver and that the passenger pulled a gun on him because Investigator Loeffler suggested that he fired the gun to protect himself. The Defendant asserted that he was unable to tell Investigator Loeffler what happened after he fired the shots because he had made up the story he was telling him and did not know the details. He claimed he agreed that the passenger had a revolver only because Investigator Loeffler had suggested this to him; he said he had no idea what kind of gun the passenger had because he was not in the car when the incident occurred.

The Defendant stated that what really happened was he and his girlfriend were walking, and Deon Nolbert came up and said he wanted to rip someone off with some fake hundred dollar bills, and he showed them the fake bills. The Defendant told Nolbert that he was not going to get away with that, and his girlfriend agreed. He said that as they were walking toward the parking lot C, he saw Kristopher Johnson and told him that what Nolbert was planning was a bad idea. The Defendant said that after that he and his cousin, Daquan Emory, started walking up the hill. When they heard shots ring out, they ran.

The Defendant admitted that he was holding the two fake hundred dollar bills and that his girlfriend's foot was in the photograph that was sent to Albert over Facebook. He also admitted knowing that the purpose of the photograph with the fake bills was to ensure that Albert would bring the marijuana. The Defendant said that he went into parking lot C because his cousin wanted to talk to Nolbert, and he was okay with that because he and Nolbert were "cool," even though they had been involved in some altercations in the past. The Defendant said he walked to parking lot C with Nolbert because they were "creating a plan to get the weed" using the fake money and that they encountered Kristopher Johnson, who was well known in the area. The Defendant denied telling Nolbert, "After this, . . .

I'm gonna be a Crip." He said that once he encountered Kristopher Johnson, he felt like something bad was going to happen, so he turned around, left Nolbert with Johnson, and started walking to his cousin's home. He acknowledged seeing a car pull into the parking lot as he and his cousin were leaving, although he did not know it was the victims' car. As he and his cousin were walking toward his cousin's house, they heard gunshots behind them. They stopped and looked and then took off running toward his cousin's house and then followed the train tracks behind parking lot C to the Defendant's house. The Defendant confirmed that it was his testimony that he did not know anything about the people who were killed and that he did not see anything. However, the Defendant acknowledged that he lied to Investigator Loeffler and admitted that he never told Investigator Loeffler the version of events to which he had testified at trial. He also admitted that he lied to Dr. Brown about being involved in a shootout with Kristopher Johnson, although he claimed he lied to protect his family. The Defendant insisted that Damon Albert and the two other victims who were killed never saw his face. He claimed that the only reason he told Investigator Loeffler that he shot the victims was to protect his family from Kristopher Johnson.

At the conclusion of trial, the jury convicted the Defendant of two counts of felony murder, two counts of the lesser included offense of second degree murder, one count of the lesser included offense of attempted second degree murder, three counts of especially aggravated robbery, and one count of employment of a firearm during the commission of a dangerous felony. The trial court merged the second degree murder convictions with the felony murder convictions and then imposed an effective sentence of life imprisonment plus eighteen years. Thereafter, the Defendant timely filed a motion for new trial, asserting in pertinent part that it was error to deny the motion to suppress his statement and that it was error to deny the motion to suppress the eyewitness identification evidence. Following a hearing, the trial court entered a written order denying the motion for new trial. Thereafter, the Defendant timely filed a notice of appeal.

## ANALYSIS

**I. Motion to Suppress Statement.** The Defendant argues that the trial court erred in denying the motion to suppress his statement to police, which he made as a juvenile. He acknowledges that the trial court properly relied on the Callahan[4] factors but argues that "the trial court erred in its findings and conclusion that the confession in this case was voluntary." In particular, the Defendant claims that his age, his lack of education and mental ability, his reduced capacity to understand the Miranda warnings, and the absence of a parent or interested adult all weighed against the admission of his statement. Because the Defendant provides a thorough analysis of the Callahan factors in his brief, it appears

---

[4] Callahan, 979 S.W.2d at 583.

that he intended to challenge whether he knowingly, voluntarily, and intelligently waived his rights under Miranda rather than whether his statement was voluntary. See State v. Davidson, 509 S.W.3d 156, 189 (Tenn. 2016) (emphasizing that "[t]he due process voluntariness test is distinct from Miranda" and that while "[t]he issue under Miranda is whether a suspect received certain warnings and knowingly and voluntarily waived certain rights[,] . . . the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion" (citations omitted)). Because the trial court never made any ruling regarding the voluntariness of the Defendant's statement and because the Defendant has failed to argue or provide any caselaw in support of the claim that his statement was not voluntary, we conclude that this issue is waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Waiver notwithstanding, the record does not support the claim that the Defendant's statement was coerced, and therefore, not voluntary. See Davidson, 509 S.W.3d at 189 ("Whether a confession was made voluntarily must be determined by a totality of the circumstances, including characteristics of the accused and the details of the interrogation" and relevant factors to be considered in determining whether a statement was made voluntarily include "the age, education, and intelligence of the accused; the extent of previous experience with law enforcement; whether questioning was repetitive and prolonged; the length of the detention prior to giving a statement; the lack of any advice to the accused of his constitutional rights; whether the accused was injured, intoxicated, drugged, or in ill health; deprivation of food, sleep, or medical attention; and physical abuse or threats of abuse.").

The State, apparently also concluding that only a Miranda argument was raised, contends that the totality of the circumstances supports the trial court's conclusion that the Defendant knowingly, voluntarily, and intelligently waived his Miranda rights. The State specifically asserts that at the time of the interview, the Defendant was fifteen years old; was in the ninth grade; was able to read and write; was not laboring under the influence of intoxicants or a mental disease, defect, or impairment; and was capable of understanding the waiver of his Miranda rights. The State acknowledges that the Defendant had some educational deficiencies and did not have an interested adult present during his interview; however, it contends that these facts do not preclude the trial court from concluding that the Defendant properly waived his rights. Although this case undoubtedly presents a close question, we agree with the State that the totality of the circumstances supports the trial

court's conclusion that the Defendant knowingly, voluntarily, and intelligently waived his Miranda rights. Accordingly, we conclude that the trial court did not err in denying the motion to suppress the Defendant's statement.

When this court reviews suppression issues, the prevailing party in the trial court "'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). "'Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" State v. Hawkins, 519 S.W.3d 1, 32 (Tenn. 2017) (quoting Odom, 928 S.W.2d at 23). A trial court's findings of fact in a suppression hearing will be upheld, unless the evidence preponderates against them. Id. (citing State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014)). However, this court reviews the trial court's application of the law to the facts de novo with no presumption of correctness. Id. at 32-33 (citing State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001)). When evaluating the correctness of a trial court's ruling on a motion to suppress, this court may consider the entire record, including not only the proof offered at the suppression hearing but also the evidence presented at trial. State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012).

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V; see U.S. Const. amend. XIV, § 1. Similarly, the Tennessee Constitution provides "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Both the Fifth Amendment and article I, section 9 provide the criminally accused the right against compelled self-incrimination. Callahan, 979 S.W.2d at 581.

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court created procedural safeguards to protect against compulsory self-incrimination. Miranda compels law enforcement to warn an individual prior to a custodial interrogation:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. The opportunity to exercise the aforementioned rights must be afforded to the individual throughout the interrogation. Id. After these warnings are given and an

opportunity to exercise these rights is afforded, the person being questioned may "voluntarily, knowingly, and intelligently" waive his right to counsel and waive his right against self-incrimination. Id. at 444, 479; Echols, 382 S.W.3d at 280; State v. Mann, 959 S.W.2d 503, 529 (Tenn. 1997).

This court must examine the totality of the circumstances in determining whether a juvenile has made a knowing, intelligent, and voluntary waiver of his or her Miranda rights. Fare v. Michael C., 442 U.S. 707, 725 (1979); Callahan, 979 S.W.2d at 581. With juvenile waivers, the totality-of-the-circumstances test requires consideration of the following factors:

(1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
(2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
(3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;
(4) any intoxication;
(5) any mental disease, disorder, or retardation; and
(6) the presence of a parent, guardian, or interested adult.

Callahan, 979 S.W.2d at 583; State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999). "These factors are sufficiently capacious to encompass coercive tactics such as threatening a juvenile with adult prosecution or promising leniency." Callahan, 979 S.W.2d at 583. While this court should "exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." Id. (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)). Likewise, the absence of a parent at the interrogation does not render a confession inadmissible. Carroll, 36 S.W.3d at 864 (citing State v. Steven D. King, No. 02C01-9509-CR-00280, 1997 WL 41256, at *3-4 (Tenn. Crim. App., at Jackson, Feb. 4, 1997)).

Regarding the first factor, the circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence, the record shows that at the time of his interview, the Defendant was fifteen years old and was no longer enrolled in high school, although he claimed he was pursuing his GED. Although the Defendant repeatedly stated that he was "just a kid" in the interview, we agree with the trial court's finding that the Defendant did this as a defensive or deflective tactic. His school records, which were attached to his motion to suppress, showed that while he was enrolled in the ninth grade, the Defendant had an Individual Education Program (IEP), was reading on a third grade level, and was receiving instruction from both regular education staff and special education

staff. The Defendant's seventh grade school records showed that the Defendant had a learning disability that affected his reading comprehension. Finally, the Defendant's fifth grade school records showed that when he was given three subtests (Vocabulary, Matrix Reasoning, and Arithmetic) from the Wechsler Intelligence Scale for Children, Fourth Edition, the Defendant's estimated IQ score was determined to be a 92, which "falls in the average range." The school then concluded, based upon the Defendant's IQ score, that "[i]ntellectual [d]isability c[ould] be ruled out as contributing to his educational difficulties." As to the circumstances surrounding the interview, the record establishes that the Defendant was interviewed after being in custody for a few hours. The audio recording from this interview shows that Investigator Loeffler was polite, friendly, non-confrontational, and concerned about the Defendant's health; it also shows that Investigator Loeffler used language appropriate for a fifteen-year-old and never threatened or intimidated the Defendant. Although the Defendant makes a general claim, without specific references to the record, that Investigator Loeffler made the Defendant promises of leniency, our review of the interview shows that while Investigator Loeffler offered to keep the Defendant and his family safe, he never made any promises of leniency regarding the Defendant's charges or sentencing. The Defendant's interview lasted approximately forty-five minutes, and the overall atmosphere of the interview was calm. The Defendant was alert, was able to easily answer all of Investigator Loeffler's questions, and was able to provide detailed facts regarding his actions at the time of the crimes. The Defendant initially denied all involvement in the crimes and then provided at least two alternate versions before finally admitting that he was the shooter. When the Defendant ultimately admitted his involvement in the offenses, he provided information that showed he had acted in self-defense. Although the Defendant became emotional and expressed concern about being incarcerated when he finally admitted that he was the shooter at the end of the interview, the Defendant's demeanor throughout the interview was cooperative and, at the end, resigned.

Regarding the second factor, the Defendant's capacity to understand the Miranda warnings and the consequences of the waiver, the audio recording of the interview shows Investigator Loeffler presented the Defendant with the Miranda form and then read to him all of the rights outlined in Miranda. As Investigator Loeffler read these rights, the Defendant was able to follow along on the Miranda form. The Defendant initialed that he understood each of his rights and stated that he had no questions about his rights. Significantly, before speaking with Investigator Loeffler, the Defendant verified that he could still get a lawyer, even if he signed the waiver form, and then the Defendant provided a self-serving reason for why he wanted to provide a statement, thus demonstrating that (1) the Defendant knew he would likely need an attorney and wanted to retain the right to counsel if he decided to speak with the investigator, (2) the Defendant understood that he did not have to talk to the investigator, and (3) the Defendant had an appreciation of the consequences of speaking with the investigator, namely that his statements could be used

against him, but decided to talk to him because he thought it would help his case. Immediately thereafter, the Defendant signed the Miranda form. While the Defendant claims that his significant mental limitations, which caused him to operate on a third-grade level, prevented him from fully understanding the meaning of the Miranda warnings, his school records show that the Defendant had an IQ of 92, which was in the average range. Even more importantly, Dr. Brown acknowledged that when she gave the Defendant the test "designed to assess someone's understanding of their Miranda warnings," the Defendant "seem[ed] to understand what the Miranda warnings are and what they meant," and the Defendant "score[d] consistently or even a little bit higher than other juveniles his age."

Regarding the third factor, the Defendant's familiarity with the Miranda warnings and the ability to read and write in the language used to give the warnings, the record shows that the Defendant was able to read and write in English, the language used to inform him of his Miranda rights. As we have previously recognized, the record shows that the Defendant was thoroughly advised of his rights, and his knowledge of and waiver of these rights was shown by his initialing each of his rights and his signature on the written waiver. Despite the Defendant's claims that he had no prior experience with the court system and no familiarity with the Miranda warnings, the presentence investigation report shows that the Defendant had violated the law several times prior to his interview, thus demonstrating that the Defendant had involvement with law enforcement and the criminal justice system. In May 2017, the Defendant was charged with disorderly conduct and was transferred to adult court, where he was convicted as charged and given probation. In October 2015, the Defendant was charged with casual exchange of a drug, although the juvenile court dismissed this charge. Also in October 2015, the Defendant was charged with criminal trespass, and he was convicted of this offense and the juvenile court sentenced him first to judicial diversion and then to probation. Additionally, a search of the Knox County Juvenile Records revealed that on May 14, 2017, the Defendant was charged with assault, robbery, and theft of property up to $1000 and that on June 9, 2017, the Defendant was charged with violation of the state registration law, violation of the financial responsibility law, and driving without a license, and all of these charges were transferred to adult court.

Regarding the fourth factor, intoxication, the audio recording shows that the Defendant was not under the influence of any intoxicants at the time of his interview. The Defendant concedes that intoxication was not a factor and that the trial court properly gave this factor no weight.

Regarding the fifth factor, characterized as "any mental disease, disorder, or retardation," the Defendant admits in his brief that he does not suffer from any mental disease or disorder. The recording of the interview shows that the Defendant did not display, or report, any mental issues. The Defendant provided clear, responsive answers

- 33 -

to all of Investigator Loeffler's questions and gave at least two alternate versions of his involvement before providing a detailed explanation of his crimes. Although the Defendant admits that he does not suffer from a mental disease or disorder, he nevertheless claims that his significant mental limitations "create profound impairments in his ability to understand and appreciate what he is being told." We acknowledge that Dr. Brown concluded, through her own testing, that the Defendant's IQ was in the seventh percentile; however, the Defendant's school records showed the Defendant had an estimated IQ of 92, which placed him in the average range.

Regarding the sixth factor, the presence of a parent, guardian, or interested adult, the record clearly shows that neither the Defendant's parents, nor any other interested adult, was present during the Defendant's interview. Defense counsel asserts that the trial court was properly concerned that the Defendant, who had the abilities of a nine-year-old, was interrogated without a parent, guardian, or interested adult, especially given that his mother had just delivered him to the juvenile detention center with the single request that he not be interrogated in her absence. Although the Defendant acknowledges that the center's authorities were not required to honor his mother's wishes, he asserts that "it would have been very simple . . . to telephone [his mother] and ask her to come back for [his] interview." Instead, he claims that "[l]aw enforcement simply chose not to include her." Defense counsel insists that "if [the Defendant] were of above-average intelligence and well-familiar with Miranda, the lack of a parent [during the interview] would matter less. However, because of [the Defendant's] limitations, the lack of a parent matters more." Regarding this factor, we agree with the trial court that Investigator Loeffler should have attempted to contact the Defendant's parents before conducting the interview; nevertheless, the law is clear that the absence of a parent at the interrogation does not render a confession inadmissible. Carroll, 36 S.W.3d at 864.

The record shows that at the time of the interview, the Defendant was fifteen years old, had attended at least some of ninth grade, was able to read and write, was not under the influence of intoxicants, did not have a mental disease or disorder and was not intellectually disabled, had previous involvement with law enforcement and the criminal justice system, and was capable of understanding the Miranda warnings and the consequences of his waiver. While the record also shows that the Defendant did not have a parent or interested adult present during the interview and that the Defendant had a learning disability related to reading, the absence of a parent does not render a defendant's statement inadmissible, and the interview recording establishes that Investigator Loeffler read the Defendant each of his Miranda rights, asked the Defendant if he understood his rights, and then asked the Defendant to initial each right if he understood it, which certainly ameliorated any issue that the Defendant had with reading. Although this case admittedly presents a close question, we agree with the State that the totality of the circumstances supports the trial court's conclusion that the Defendant knowingly, voluntarily, and

- 34 -

intelligently waived his <u>Miranda</u> rights. Accordingly, we conclude that the trial court properly denied the motion to suppress the Defendant's statement. In reaching this conclusion, we recognize that even if the Defendant's statement somehow should not have been admitted, the record contained considerable evidence of the Defendant's guilt, most significantly in Damon Albert's eyewitness identification of the Defendant as the shooter in this case, in Courtney Walker's identification of the Defendant fleeing the scene, and in the proof showing the Defendant's clear involvement in the scheme to rob the victims. For all of these reasons, the Defendant is not entitled to relief on this issue.

**II. <u>Motion to Suppress Eyewitness Identification Evidence.</u>** The Defendant also argues that the trial court erred in denying his motion to suppress the eyewitness identification evidence. Referencing the factors in <u>Neil v. Biggers</u>,[5] the Defendant claims that Damon Albert had a limited opportunity to view the perpetrator at the time of the offenses, that Albert's attention was diverted by a number of factors when he was initially exposed to the perpetrator, that Albert initially stated that he did not know who shot him prior to identifying the Defendant in the photographic lineup, and that Albert was never asked to state the confidence of his identification at the time of the photographic lineup. He asserts that because the balance of these factors demonstrates a substantial risk of misidentification, the evidence clearly preponderates against the findings of the trial court. In response, the State contends that the Defendant has failed to argue, much less show, that the identification procedure in this case was suggestive and that even if it was suggestive, the identification of the Defendant was reliable based on the totality of the circumstances. We conclude that although the identification procedure in this case was suggestive, the indicia of reliability are strong enough to outweigh the corrupting effect of the suggestive identification procedure. Accordingly, we conclude that the trial court properly admitted Albert's identifications of the Defendant, during both the photographic lineup and at trial.

The United States Supreme Court identified "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." <u>Perry v. New Hampshire</u>, 565 U.S. 228, 232 (2012). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary[,]" and "[e]ven when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." <u>Id.</u> at 238-39 (2012) (citing <u>Manson v. Brathwaite</u>, 432 U.S. 98, 112-13 (1977); <u>Biggers</u>, 409 U.S. at 198-99). Instead, the Due Process Clause requires courts to determine, on a case-by-case basis, whether improper police conduct during the identification procedure created a "substantial likelihood of misidentification." <u>Id.</u> at 239 (quoting <u>Biggers</u>, 409 U.S. at 201) (citing <u>Brathwaite</u>, 432 U.S. at 116). If the conduct did create a substantial likelihood of

---

[5] 409 U.S. at 199-200 (1972).

misidentification, the trial court "must disallow presentation of the evidence at trial."  Id. at 232.  However, "if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth."  Id.

In Neil v. Biggers, the Court effectively established a two-part analysis for determining whether evidence of an identification from a lineup is admissible under the due process clause.  Specifically, the court must determine (1) whether the identification procedure was unnecessarily suggestive and (2) if the identification procedure was unnecessarily suggestive, then it must then determine whether, under the totality of the circumstances, the identification was nevertheless reliable.  Biggers, 409 U.S. at 198-99; see Brathwaite, 432 U.S. at 106 ("The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." (footnote omitted)).   In determining whether an identification is reliable, the following factors should be considered:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200.

The first step in the two-part analysis requires the trial court to determine whether the identification procedure was unnecessarily suggestive.  Id. at 198-99.  After hearing the evidence presented at the suppression hearing, the trial court concluded that the identification procedure in this case was not unnecessarily suggestive.  However, after carefully evaluating the record in this case, we respectfully disagree with this conclusion.

The record in this case clearly shows that Investigator Cook not only knew that the Defendant's photograph had been included in the photographic lineup but also knew its precise location within the lineup.  Such deviations from proper procedure can cause an officer, whether purposefully or inadvertently, to influence the eyewitness, which can then result in a false identification.  Even more problematic is Investigator Cook's failure to properly inform Albert that the perpetrator might or might not be included in the photographic lineup; instead he bluntly stated, "I'm gonna show you some line ups, ok[ay]? And I want you to tell me who you recognize."  An officer's failure to give the simple admonition that the perpetrator may or may not be in the lineup can result in an eyewitness feeling pressure to choose one of the individuals in the lineup, even if none of the included

individuals match the eyewitness's memory of the perpetrator. Lastly, Investigator Cook neglected to obtain a confidence statement from Albert after he identified the Defendant. A confidence statement provides a clear measurement of the certainty of the eyewitness's identification, which is significant in and of itself and proves useful if the eyewitness's degree of certainty regarding the identification changes over time. In light of all of these issues, which were easily avoidable, we conclude that the identification procedure in this case was unnecessarily suggestive. Accordingly, we must next consider the Biggers factors to determine whether, under the totality of the circumstances, there was sufficient indicia of reliability to outweigh the corrupting effect of these suggestive circumstances.

First, regarding the opportunity of the witness to view the criminal at the time of the crime, the record shows that Albert was within a foot or two of the perpetrator and that Albert's interaction with the perpetrator was during a purported drug deal inside a car in the early afternoon at a time when there was abundant natural night. Albert was able to thoroughly observe the perpetrator, without stress or fear, inside the car for several moments before the perpetrator pulled out his gun and began shooting. Although the Defendant claims that Albert had only a brief period of time in which to observe the perpetrator and that Albert was not keeping the perpetrator in his gaze that entire time," we conclude that the record clearly establishes that Albert had more than sufficient opportunity to view the perpetrator. This factor weighs in favor of the reliability of Albert's identification.

Second, regarding the witness's degree of attention, the record shows that Albert was able to observe the perpetrator, in broad daylight, as the perpetrator walked over to the car, got into the backseat beside him, and then seemed to participate in the drug transaction before pulling out his gun and firing the shots. The Defendant, referencing Dr. Neuschatz's testimony, argues that the presence of the gun would have diverted Albert's attention away from perpetrator and that Albert's attention was distracted by a number of factors at the time of the exposure to the perpetrator, including that Albert looked out the window of the car, smoked a cigar, focused on what the other occupants of the car were doing, and listened to the conversation between Jaloen Morris and Deon Nolbert. Despite these claims, we conclude, based on the record, that Albert's attention was sufficiently focused on the perpetrator in order to correctly identify him. Accordingly, this factor also weighs in favor of the reliability of Albert's identification.

Third, regarding the accuracy of the witness's prior descriptions of the criminal, the record shows that Albert provided no physical description of the perpetrator prior to his identification of the Defendant in the photographic identification. The Defendant argues that because Albert initially told officers at the scene that he could not be sure who shot him, there was a substantial risk of misidentification during the lineup. Because Albert provided no description that could be compared to the photograph of the Defendant in the

lineup, there is no basis to evaluate this factor, and it neither weights in favor of or against the reliability of Albert's identification.

Fourth, regarding the level of certainty demonstrated by the witness at the time of the confrontation, the audio recording of the photographic identification shows that Albert immediately and without hesitation identified the Defendant from the photospread. The Defendant, referencing Dr. Neuschatz's testimony, contends that because Albert was not asked to state the confidence of his identification at the time of the photographic lineup, the trial court was unable to evaluate the level of certainty of Albert's identification of the Defendant. The Defendant also asserts that although Albert expressed confidence in his identification of the Defendant as the perpetrator at trial, the trial followed both Albert's exposure to the suggestive photographic lineup and Albert's observation of the Defendant at an earlier hearing. After listening to the audio recording of the photographic lineup, we conclude that Albert's response was immediate, assured, and unwavering. We also conclude that Albert's tone, which is evident from the recording, indicated a very high level of certainty in his identification. Therefore, this factor also weighs in favor of the reliability of Albert's identification.

Fifth, regarding the length of time between the crime and the confrontation, the record demonstrates that only a few hours passed between commission of these crimes and the presentation of the photographic lineup, and the Defendant concedes that this factor supports the reliability of Albert's out-of-court identification. Because the time between these crimes and the confrontation was exceedingly brief, this final factor also weighs in favor of the reliability of the identification.

After weighing the Biggers factors, we conclude that the indicia of reliability of the identification are strong enough to outweigh the corrupting effect of the suggestive identification procedure. Accordingly, we conclude that Albert's identifications of the Defendant, both during the photographic lineup and at trial, were properly admitted. The Defendant is not entitled to relief.

## CONCLUSION

Because the trial court properly denied both the motion to suppress the Defendant's statement and the motion to suppress the eyewitness identification evidence, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE